UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**

v.                          Case No.:  3:21-cr-96-MMH-JBT

**CHRISTOPHER LEE SMITH,**
    **Defendant.**

___

### CHRISTOPHER LEE SMITH' SENTENCING MEMORANDUM

The Defendant, **CHRISTOPHER LEE SMITH**, by and through his undersigned attorney, submits this memorandum in aid of the sentencing hearing currently scheduled for March 3, 2025, at 1:30 p.m.  Mr. Smith asks the Court to consider the following in determining the appropriate sentence herein:

**I.**     **INTRODUCTION**

Mr. Smith stands before the Court with incredible remorse and regret for his actions in this case.  In many ways, Mr. Smith is a victim himself, a victim of his emotional and sexual abuse as a child and of his subsequent mental health issues.  None of what happened to him is a defense or excuse for his behavior and he knows it.  Defense counsel does not include that information as an excuse but rather as context for his actions.  Nonetheless, he will stand before this Court prepared to face the consequences for his actions.  He accepted responsibility for those actions and pled guilty to Count Three of

the Indictment charging Production of Child Pornography, a violation of 18 U.S.C. § 2251(a) and 2251(e), a Class B felony. He faces, as it is currently calculated, a minimum mandatory of 25 years to 50 years in prison. Based on a total offense level of 42 and a criminal history category of II, Mr. Smith is facing an advisory guidelines term of 360 months to 600 months.

This Court must impose a sentence that is "sufficient, but not greater than necessary, to comply" with the purpose of sentencing. 18 U.S.C. §3553(a). The goal of sentencing "is to lock in a sentence that is not too short and not too long, but just right to serve of purposes of §3553(a)." *United States v. Irey*, 612 F.3d 1160, 1197 (11th Cir. 2010) (*en banc*). Mr. Smith respectfully submits that a downward variance to the minimum mandatory sentence is sufficient to satisfy the purposes of sentencing in this case, as set forth in 18 U.S.C. § 3553(a) and that a more restrictive punishment would be greater than necessary. Under the facts of this case, such a sentence will protect the public, provide just punishment and afford adequate deterrence.

## II.    LEGAL STANDARD

The Court should consider all of the applicable factors set forth in Section 3553 of Title 18 of the United States Code. *Gall,* 552 U.S. at 49-50. Under Section 3553(a) "the court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. The purposes of

sentencing, pursuant to Section 3553(a)(2), are: to reflect the seriousness of the offense, promote respect for the law and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id*. At § 3553(a)(2) (A-D). Though the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a), two of the most relevant factors are the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1).

### A. The Nature and Circumstances of the Offense

The Presentence Investigation Report certainly lays out the pertinent facts in thorough details. Defense counsel notes that, while certainly serious and concerning, several facts may be relevant to the Court in determining whether a downward variance is appropriate. First, during the undercover officer's conversations/messages with the minor male, the minor male expresses interest in meeting and engaging with the undercover for sexual purposes. Second, the minor male referenced a video of himself with another adult male that is not Christopher Smith. While Mr. Smith certainly understood that the minor male could not legally give consent, and therefore, he is culpable for his actions, it is also equally clear that this is not a situation

in which the minor male was 'groomed' or coerced in any way during the course of conduct underlying this offense. The Defense submits that that information is material and relevant to the Court in determining Mr. Smith's sentence.

### B. History and Characteristics that Support a Downward Variance

There is scientific literature that clearly establishes that childhood abuse effects the developing brain. Brains of children raised in abusive homes become adults with high levels of anxiety and depression which affects their logic and reasoning processing centers. These effects impact their ability to lead healthy lives and impacts all of their relationships.

Christopher Smith was born in Waycross, GA in October 1981. He is the only child of his parent's marriage, although he has two older brothers on his father's side who he was never close to. His mother is Alesia Marie Smith, a woman who is now elderly and was looking forward to having the support and assistance of her son in her old age. Even though their relationship has been fraught over the years, Mr. Smith still loves his mother and one of the hardest things he has had to deal with is that he may never see her again. He has lost so many people in his life that he was unable to see before their deaths, particularly his father, who died while Mr. Smith was in Florida State Prison, amongst others.

Since he was about 6 years old, Mr. Smith knew he was gay. He said he knew because of how he felt around other boys and the types of activities he naturally gravitated toward such as dance and theatre, as they were more stereotypically effeminate. Mr. Smith's mother added that she suspected he was gay as a child, but never confronted him about it. She said at the community theatre there were "a lot of gay people around" and that her son "loved being in plays." She also offered that he "had more adult friends than same-aged peers." Mr. Smith withheld his sexuality growing up because he had a couple maternal Uncles in the "Klan" and his maternal grandmother "Nanny" was a staunch Southern Baptist with strong homophobic beliefs. He feared that he would not be accepted by his family if he lived in the truth of who he is as a youngster. He spent most of his young life hating and suppressing his true nature, engendering within himself the source of his later severe depression and anxiety.[1]

Mr. Smith remembers his childhood being one he spent learning to please others and appease his parents as it ensured his survival and that his basic needs were met. He was the subject of constant and persistent bullying as a child from elementary to high school. His mother added that kids at school

---

[1] See attached Exhibit 5, a psychological report prepared by Dr. Deitchman, filed under seal and provided to this Court and relevant parties.

5

called him a "faggot" all the time because he was "emotionally considerate" toward others. He described himself as the loner kid that everyone thought was weird. Mr. Smith's tone overall is one of sadness and disappointment that he couldn't live up to the potential he knows himself to have, and this is compounded by his persistent preoccupation for maintaining the image of himself he has shared with others. The Community Theatre was a family affair at first for Mr. Smith, so his parents trusted the people there. In addition to the Community Theatre, Mr. Smith was involved with the local Boy Scout troop, which he loved. He loves the outdoors.

Beginning at approximately 5-6 years of age, Mr. Smith recalls being sexually molested for the first time while over at a neighbor's home where an older male neighbor had client touch him inappropriately in the bath. He vaguely remembers his friend's father playing a role by telling the boys what to do. There were other incidents where Mr. Smith recalls an older cousin making him perform oral sex on his older cousin while out riding bikes by the river. At Boy Scout Summer Camp, Mr. Smith remembers being cornered in the bathroom by an adult Scout Leader where he was all by himself. The Scout Leader performed sexual acts upon Mr. Smith. The feelings of abuse, victimization, confusion, and shame haunt Mr. Smith to this day. He submitted a written affidavit of his abuse to be part of the Boy Scouts Bankruptcy

6

lawsuit.[2] Mr. Smith left the camp to go home. His father was irate that he was wasting the money that had already been paid for the camp and sent him back. He spent the remainder of his time there afraid and ashamed. Several months later, the community theatre director, John Youmans (deceased Nov. 2021) and his boyfriend at the time invited Mr. Smith over to their home and raped him. Mr. Smith didn't know it at the time, but in hindsight he believes he was groomed for a long time leading up to the rape, and continued abuse. Mr. Youmans would offer him pot and alcohol like he was "special" and tell him it was "their little secret." The Court is rightfully concerned with the victim in the case before the Court, but the Court system does not often look back at the victims that the defendants in these cases were themselves, and the long-lasting damage that their own abuse did to themselves and others.

Around the time the rapes started, Mr. Smith's father was slumped in a deep depression, and his antique and antique repair business was failing. Mr. Smith's father took a bunch of muscle relaxers and locked himself in his room. Mr. Smith remembers his father blaming him for feeling suicidal. His parent's relationship deteriorated badly, and Mr. Smith grew up in the margins of their strained marriage and substance abuse. Mr. Smith described his father as a depressive pot smoker, while his mother was a binge drinker. She worked at

---

[2] See attached Exhibit 3, Proof of Claim form.

bars and restaurants and was always up for a party. Mr. Smith recalled being about 10/11 years old when his parents began fighting physically with one another. He would always escape to his Nanny's house, and his parents wouldn't realize he was gone. Mr. Smith said age 12-15 were the worst years of his life. He resented his family and resented God. Later in life, Mr. Smith reconciled with his father and felt tremendous guilt about how he'd resented his father as a teen. Hope Smith (client's daughter) noted that her grandmother (Alesia Smith) was emotionally unstable and had scars all over her arms from acts of self-harm.

Mr. Smith's mother verified that he went to Ware County Magnet schools. He did fairly well in school in spite of his turbulent and abusive home life. Unfortunately, in his senior year at Brantley County High School, he became ill, leading to too many absences to graduate on time. Mr. Smith later earned his GED.[3] In 2002 Mr. Smith said he took his SATs and had intentions to go to Waycross College, but he couldn't get financial aid. Any long-term prison sentence is challenging to the inmate's mental health, and it would be especially so to Mr. Smith, given his diagnosed severed depression and anxiety. In light of that, Mr. Smith has thought about what goals he'd like to achieve. Of course, first among those is intensive sexual offender treatment, but he also

---

[3] See attached Exhibit 2, Certificate of GED.

8

aims to improve his educational and vocational skills. Given his age, Mr. Smith is aware that he may not ever see free air again, but if he does, he wants to be able to work and support himself within his community.

While Mr. Smith attended middle school, he met his future wife, Tabatha Smith. She was a nerdy girl who would associate with him. They were friends. Mr. Smith and Tabatha married in 2002/2003. They were young, and, for the most part, the marriage was a way to keep up appearances with their respective families as well as in the community. Mr. Smith stated that he catered the whole wedding, but most of his photos and important mementos were destroyed in a house fire in 2008. Mr. Smith's mother stated that she never really cared for Tabatha. Mr. Smith and Tabatha had a daughter in 2001 – Hope Smith. Early on in their marriage, Mr. Smith and Tabatha agreed that they were not suited for monogamy, and each went his/her separate way romantically.

In the meantime, Mr. Smith had become the VP of productions at Trembling Earth Productions (the community theatre) where he was still actively being sexually abused by the owner, John Youmans. By this point, since Mr. Smith had grown up being abused by Mr. Youmans, the abuse was just a dynamic of their relationship. Mr. Smith always feared leaving the abusive relationship for fear of losing his job. On the one occasion Mr. Smith

denied Mr. Youmans sexually, he kicked him out of the theater and out of the company. The message was clear: the only way Mr. Smith could continue to enjoy the benefits of lead roles and positions in the company was by his continued allowing of the abuse. Hope Smith remembers going over to John Youmans house frequently as a child which was set up like Planet of the Apes. Hope added that she had more adult friends than peer-aged friends (just like her grandmother had said of her father).

Only two days before Mr. Smith's 2011 arrest in St. John's County, he was sexually abused for the last time by John Youmans on the set of a play at the theatre company. Mr. Smith felt so alone. The loneliness is such a trigger to him emotionally. He hates himself for trading abuse for a job and accepting it for years. The compulsion to go online in a seemingly anonymous way was an escape for him. Yet, he also recognizes that what he was doing was wrong. Mr. Smith responded to an ad on Craigslist which led to his arrest. It was an undercover agent/officer playing the role of a mother who wanted to involve someone in teaching her child about the "birds and the bees." Although he never went through with meeting with the fictitious person, he was in a fantasy. To him it was just another "role" like the roles he played in everyday life. He's always been avoidant in life and would create fantastical realities in his mind to avoid the codependent relationship hell in which he lived. He went

to trial on the 2011 case given that he "had nothing to lose" at the time. Leading up to that point, Mr. Smith was battling internally to express himself authentically and his fear of being rejected overwhelmed him. He ended up being sentenced on one charge of traveling to meet a minor after use of a computer to solicit a parent/guardian/custodian of a child to 15 years in prison initially. The sentence was reduced in 2016 to 8 years prison followed by 7 years on probation. Mr. Smith was released in February 2018 and started probation.

While he was serving this sentence, his marriage to Tabatha officially ended through a divorce in 2012. Upon release from prison, Mr. Smith settled in St. Augustine and found work quickly and without too much trouble. He worked mainly in the restaurant industry and did well there. Before long he moved out of his motel accommodations into an apartment, and his adult daughter came to see him, and lived with him for a short time. Mr. Smith was going to group therapy and counselling at ITM Group in St. Augustine. There he submitted to two polygraphs which indicate no contradictory responses to examiners questioning. He spent most of his time at work or at his treatment classes. He struggled, however, to find and maintain adult relationships. He treasured the few that he did have. Mr. Smith was happy to reunite with his daughter, have a peer mentor (Alvin Smith) from ITM Group, and a friend who

lived nearby (Betthany Kimball). On the surface, it seemed like he was really getting his life back on track. But the loneliness and emotional toil he was feeling inside was something he kept bottled up except for at therapy sessions. In August 2019, Mr. Smith was seen for a psychological evaluation and treatment at Stuart Marchman Act in St. Augustine where he expressed the was struggling and "feeling overwhelmed" in addition to feelings of social anxiety and panic. Mr. Smith has mentioned on different occasions that loneliness is a cause for poor decision-making on his part. And the loneliness was especially bad at the time of his arrest in late summer 2021.

Mr. Smith stated that he knew he began to slip emotionally in summer 2020. The news of his diagnosis[4] added to his inner feelings of worthlessness and despair. Since 2018, Mr. Smith's medical records evidenced suspicion of some troubling "viral syndrome" attacking his body, but there was not enough to detect HIV, despite several screenings in 2018 and 2019. In August of 2020, he was finally diagnosed. Since his diagnosis, Mr. Smith has managed to keep his viral load below detectable range with regular medication, which means that it is not infectious.

In addition to his history of abuse and the resultant mental health

---

[4] See attached Exhibit 6, St. Johns County Health Department which includes his diagnosis for HIV, among other medical issues. Filed under seal and provided to this Court and relevant parties.

12

issues that created, Mr. Smith's medical issues are another reason that would support a downward variance by the Court. He suffers from Hyperlipidemia, Irritable Bowel Syndrome, and Gastroesophageal reflux disease. His time at the Baker County Jail has been especially difficult because his medical ailments have not been treated appropriately either by diet or medication and he has suffered greatly on a regular basis.

### C. <u>Legal Considerations Regarding the Sentence to be Imposed</u>

In addition to his history and characteristics, Mr. Smith submits two additional reasons that the Court should consider a downward variance. The first is Mr. Smith's cooperation with Baker County Jail officials in two different investigations. The first involved an attorney who brought in drug-soaked papers to his federal client. The authorities are still apparently weighing their options in reference to potential charges in that case so a name was not provided. The second case involved a Baker County Jail employee, Evelyn Rhodes, who was prosecuted for smuggling contraband into the jail for an inmate with whom she had developed a relationship. In both cases, Mr. Smith provided valuable information to the investigating Inspector who directly helped to form the cases against these individuals.[5] This behavior evidences

---

[5] This information was confirmed by Inspector Christianna Combs in a conversation with Federal Defender's Office Investigator Paul Pinkham.

Mr. Smith's attempts to behave as well as he can, given his circumstances, and assist law enforcement when possible.

Mr. Smith also asserts that the enhancement based on his prior conviction is not well-placed and that the appropriate range of penalties is fifteen to thirty years, rather than 25 to 50 years. He bases this argument on the grounds that in order for the higher penalties to apply, there must be at least one prior conviction under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward or sex trafficking of children, of the production, possession, receipt, …. Of child pornography. To determine whether a prior conviction triggers the § 2251(e) enhancement, the sentencing court should employ a categorical approach, looking only to the statutory element of the offense, without inquiring into the Defendant's specific conduct in committing it. *See* <u>United States v. Kushmaul,</u> 984 F.3d 1359 (11th Cir. 2021); <u>United States v. Dullea,</u> 296 F. App'x 733 (11th Cir. 2008) (stating that under the categorical approach, courts "look no further than the fact of conviction and the statutory definition of the prior offense"). The prior conviction at issue was under Fla. Stat. §847.0135(4)(b), the elements of which are: Knowingly traveling within, to or from Florida; For the purpose of engaging in any illegal act in violation of chapters 794, 800 or 827 of the Florida Statutes or to otherwise engage in other unlawful sexual conduct with

14

a child" or a person believed by the defendant to be a child; after using a computer or electronic device to solicit, lure or entice the parent, legal guardian or custodian of a child or a person believed by the defendant to be so, to engage in any aforementioned illegal act or other unlawful sexual conduct.

*United States v. Walker*, 2023 U.S. U.S. Dist. LEXIS 31559 (Case No. 3:21-cr-59, decided February 27, 2022, Northern District of Florida, Pensacola) appears to be the first case in this Circuit to address whether a prior conviction under Fla. Stat. § 847.0135(4)(b) constitutes a predicate for 18 U.S.C. § 2252A(b)(1)'s sentencing enhancement. There, the Court applied the categorical approach to determine whether the least of the acts criminalized under the Florida Statue necessarily "relates to aggravated sexual abuse, sexual abuse or abusive sexual conduct of a minor or ward." See Kushmaul, 984 F.3d at 1364. There, the Court ruled that a prior conviction under Fla. Stat. § 847.0135(4)(b) is not an offense categorically related to the sexual abuse of a minor and that the enhance mandatory minimum does not apply. Therefore, the Court should find that the enhanced penalties do not apply to Mr. Smith.

### III.   CONCLUSION

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence and incapacitation. Mr. Smith has expressed

15

genuine remorse and contrition, was honest and straightforward with the authorities when they questioned him and cooperated fully with their investigation. He has accepted his responsibility for his actions without reservation and has never tried to minimize his behavior. This along with the other factors noted above support a sentence at the lowest minimum mandatory sentence that the Court can impose. Given all the facts and circumstances of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

**A. FITZGERALD HALL, ESQ.**
**FEDERAL DEFENDER**

Respectfully Submitted By:

***/s/ Waffa J. Hanania, Esq.***
Waffa J. Hanania, Esq.
Assistant Federal Defender
Florida Bar No. 0888631
200 West Forsyth Street, Suite 1240
Jacksonville, Florida 32202
Telephone: (904) 232-3039
Fax: (904) 232-1937
Email: waffa_hanania@fd.org

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 28th day of March 2025 a true copy of the foregoing was served by electronic notification to Rodney Brown, Office of the United States Attorney and Omayra Hernandez, United States Probation Officer.

*/s/Waffa J. Hanania, Esq.*
Waffa Hanania, Esq.